Joe MARSH, Leroy Owens, Plaintiffs-Appellants,

v.

BUTLER COUNTY, ALABAMA, the Butler County Commission, et al., Defendants-Appellees.

No. 99-12813.

United States Court of Appeals,

Eleventh Circuit.

Sept. 7, 2000.

Appeal from the United States District Court for the Middle District of Alabama.(No. 97-01421-CV-D-N), Ira De Ment, Judge.

ON SUA SPONTE RECONSIDERATION

Before BIRCH, BARKETT and ALARCON[*], Circuit Judges.

BARKETT, Circuit Judge:

Upon reconsideration, this court, sua sponte, VACATES its prior opinion in this matter, published at 212 F.3d 1318 (11th Cir.2000), and substitutes the following in its place:

Joe Marsh and Leroy Owens, former inmates at Butler County Jail in Greenville, Alabama, appeal the district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) of their complaint against Butler County, the Butler County Commission, and Sheriff Diane Harris in both her individual and official capacities. Marsh and Owens sued under 42 U.S.C. § 1983, claiming that their rights under the Eighth and Fourteenth Amendments were violated by the County, the County Commission, and the Sheriff's deliberate indifference to the substantial risk of serious harm to inmates at Butler County Jail. Owens also claimed that his rights under the Fourteenth Amendment were violated by their deliberate indifference to his serious medical needs. Marsh and Owens claim that the injuries they suffered, although arising from distinct incidents, were caused by the same unconstitutional jail conditions and jail practices. The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6), on the grounds that Butler County and the Butler County Commission are protected from this suit by legislative immunity, and that Sheriff

---

[*]Honorable Arthur L. Alarcon, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

Harris is protected by qualified immunity. We reverse.

DISCUSSION

The dismissal of a complaint for failure to state a claim is reviewed de novo. *In re Johannessen,* 76 F.3d 347, 349 (11th Cir.1996) In conducting such a review, appellate courts must keep in mind that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236-37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In interpreting Federal Rule of Civil Procedure 8, which governs the filing of complaints, the Supreme Court has held that a plaintiff need only set out " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). That requirement is no different in cases brought under Section 1983. Indeed, the Court has explicitly held that courts may not apply a "heightened pleading standard" over and above the dictates of Federal Rule of Civil Procedure 8(a) to claims under Section 1983.[1] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

This case involves a complaint filed against Butler County, the Butler County Commission, and Sheriff Diane Harris. The claims against the County and the County Commission on the one hand and Sheriff Harris on the other involve different questions of liability and immunity as different types of governmental entities are entitled to different types of immunity. In order to determine whether Marsh and Owens have stated legal claims against Butler County, the Butler County Commission, and Sheriff Harris, we must first ascertain the type of governmental body or officer each represents, which will determine the type of conduct

---

[1]Federal Rule of Civil Procedure 8(a) states:

> (a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

each may be held liable for under Section 1983. In determining the particular functions of a governmental body or official, we must refer to the state law definitions of that entity's functions. *Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285, 1287 (11th Cir.1998) (en banc). This Court has stated that "[o]ur analysis of Alabama law persuades us that an Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail." *Id.* at 1288. Thus, we examine Marsh and Owens' complaint to determine both whether it states a claim against the County and County Commission as local governmental bodies, and whether it states a claim against Sheriff Harris as a state official in either her official or personal capacity. Accordingly, we discuss the claims against the County and the Commission separately from those against Harris.

I.      *Claims against Butler County and the Butler County Commission*[2]

A.      *Allegations in the Complaint*

In order to state a claim under Section 1983 against a local governing body, a plaintiff must allege that he suffered an injury under federal constitutional or statutory law, and that his injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A local governing body may also be held liable for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels," but may not be held liable under a theory of vicarious liability. *Id.* at 690-91, 98 S.Ct. 2018. The extent to which the County may be held liable for violations of federal law at the Butler County Jail is proscribed by the extent to which the County is responsible for the conditions therein. In Alabama, the distinct responsibilities of counties and sheriffs with respect to the operation and maintenance of county jails have been recognized by this Court. We have held that the "duties of the counties with respect to the jails 'are limited to funding the operation of the jail and to providing facilities to house the jail.' "

---

[2]We henceforth refer to Butler County and the Butler County Commission collectively as "the County." The County Commission is the governing body of the County, and the liability and immunity analyses are identical for both entities.

*Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285, 1289 (11th Cir.1998) (en banc) (quoting *Stark v. Madison County,* 678 So.2d 787, 787 (Ala.Civ.Ct.App.1996)). "The county commission is charged with erecting and maintaining jails, and each county is required to maintain a jail of sufficient size and strength to secure the prisoners." *Id.* at 1289-90 (quoting Ala.Code §§ 11-14-10, 11-14-13 (1989)).

In their complaint, Marsh and Owens claim that the County's "deliberate indifference to the substantial risk of serious harm to inmates at Butler County Jail" resulted in substantial injury to them, in violation of their Eighth and Fourteenth Amendment rights. In order to state such a claim successfully for the purposes of a Rule 12(b)(6) motion, Marsh and Owens must allege facts supporting each element of a deliberate indifference claim. Thus, the complaint must allege facts demonstrating: 1) that inmates at Butler County Jail were subjected to a substantial risk of serious harm; 2) that the County was deliberately indifferent to that risk; 3) that there was a causal link between the acts or omissions of the County and the excessive risk of violence; and 4) that there was a causal link between the excessive risk of violence and the injuries suffered by Marsh and Owens. *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582-84 (11th Cir.1995); *see also Farmer v. Brennan,* 511 U.S. 825, 837, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). For the purposes of reviewing the district court's dismissal of the plaintiffs' complaint, we must accept all facts alleged in the complaint as true. *Fortner v. Thomas,* 983 F.2d 1024, 1027 (11th Cir.1993). Of course the facts as stated herein may differ from the facts ultimately determined by a jury.

The complaint in this case makes the following allegations about conditions in Butler County Jail. The Butler County Jail, a two-story building located in downtown Greenville, Alabama, was constructed in 1929 and 1930. By 1996, because the County failed to maintain the facility over the years, the building was in an extremely dilapidated and poor physical condition. Sewage leaked from overhead pipes. Showers were covered with rust, mildew and peeling paint. Sinks and toilets were dilapidated and inoperable. Hallways were littered with trash. Windows were cracked and could not be closed. Shards of broken glass lay in the window sills. Rats, cockroaches and other rodents and vermin entered the jail through broken windows and cracks in the walls. The locks on inmate cells on the second floor of the Jail had been inoperable since at least

1995. As a result, inmates housed on the second floor have been able at all times to open their cell doors and walk into the hall, other cells, or the dayrooms whenever they wished, and they did so.

The complaint further alleged that the Jail was grossly understaffed. Despite the fact that jailers had numerous duties,[3] the Jail was often staffed by only one person. Jailers spent most of their time sitting at a desk at the entrance to the Jail on the first floor, from which position they could not view any of the inmate cells, dayrooms, or the kitchen. In fact, most inmate living areas at the Jail were completely unsupervised. Jailers were "too afraid to conduct visual inspections of inmate cells on the second floor" because the broken locks prevented them from ever locking down the inmates. The Jail had no visual or audio surveillance system on the second floor, and no jailer was assigned there.

Because of the poor condition of the Jail, inmates were able "to vandalize [the facility], break windows, and rip metal pipes and other dangerous objects from the structure." Due in part to the low perimeter fence around the exercise yard, inmates were also "able to obtain screwdrivers, sticks, and [make-shift knives called] 'shanks' from outside the exercise yard."

As a result of the County's failure to maintain a jail of sufficient size and strength to adequately secure and protect the prisoners, Marsh and Owens contend that inmates at Butler County Jail faced a substantial risk of serious harm at the hands of other inmates. Inmates were able to acquire weapons from in and around the Jail facility, and were able to roam freely among the rooms on the second floor without supervision. In the event that those unsupervised and armed inmates attacked someone, inmates on the second floor were unable to contact jailers directly. If they needed assistance, they either shouted out the windows or banged on the walls. Even then, "[j]ailers often did not respond."

The complaint further alleges that the County "knew and should have known about [the] risk" to

---

[3]Jailers' duties included controlling the inmate population, which could exceed fifty persons; administering inmate intake and release; controlling the electronic gate in the fence surrounding the Jail; supervising visitation and outdoor exercise; handling mail; coordinating food service; dispensing medication; supervising trustees; and answering the Jail telephone. On weekends, jailers were also responsible for answering telephone calls to the Butler County Sheriff's Department and for operating the dispatch radio. Because their duties were so overwhelming, jailers often relied on unsupervised inmate trustees to assist them by, *e.g.,* distributing medicine, unloading supplies, and sometimes handling the Jail's keys.

inmates, and "failed to take measures to abate [the] substantial risk of serious harm." Marsh and Owens alleged that the County was "repeatedly informed that more staff was needed at the jail" and that "the jail was not reasonably secure." Critical reports from the Alabama Department of Corrections and several other state agencies, numerous inmate complaints and requests for assistance, and a federal civil rights action filed in May 1996 put the County on notice of the poor conditions at the Jail. In spite of these warnings, by July 1996, it had failed to take measures to ameliorate the situation. The County "did not improve the physical condition of the jail or maintenance practices ..., did not repair the locks on the second floor," and did not increase staffing at the Jail.

In their complaint, Marsh and Owens alleged that the substantial risk of harm faced by the inmates at Butler County Jail was traceable to the acts and omissions of the County. In particular, they alleged that they were subject to a substantial risk of serious harm because inmates were able to fashion weapons by vandalizing the decrepit Jail facility. Inmates were also able to secure weapons from in and around the outdoor exercise area due in part to the inadequacy of the perimeter fence. Moreover, Marsh and Owens alleged that inmates faced substantial risk of harm as a result of the broken locks on the second floor of the Jail. Because jailers were not able to lock down inmates on the second floor, the jailers were afraid to enter the floor, and thus could not perform necessary health and safety checks. Inmates were also permitted to roam freely among the cells and other rooms on the second floor because of the broken locks. In addition, the Jail did not utilize any visual or audio surveillance system. Finally, Marsh and Owens alleged that the Jail was chronically under-staffed, resulting in inadequate supervision and discipline of the inmates.

The complaint then delineates the injuries suffered by Marsh and Owens as a result of the deplorable jail conditions and the County's failure to address them. As to Marsh, the complaint alleges the following. On July 2, 1996, Joe Marsh was resting on a bunk bed in a cell on the second floor of the Jail when four inmates entered the cell and one of them challenged Marsh to a fight in the dayroom. "When Marsh refused, the inmate struck him across the head with a metal pipe." The three other inmates joined in the assault on Marsh, which lasted for several minutes. "They punched, kicked, and hit Marsh with the pipe while he was

balled up in a corner. One inmate cut Marsh with a screwdriver while the other three held him." While the assault was in progress, other inmates on the second floor "shouted and pounded on the walls" in an attempt to procure assistance from the jailers on the first floor. After being struck with the pipe a final time in the head, Marsh managed to walk toward the entrance to the back side to seek help. His face and head were covered in blood. As a result of the assault, Marsh suffered lacerations on his face, on the back of his head, and on this back. In addition, he sustained a fracture to the bone above his left eye. Since leaving the Jail, Marsh has suffered from frequent headaches and nightmares about the assault.

On the evening of July 3, Leroy Owens entered the dayroom on the second floor of the Jail, followed by the four inmates who had assaulted Marsh. One of those inmates "hit Owens over the head with a metal pipe," and "[a]nother hit him with a water cooler." They proceeded to smash his head against a metal table, kick him, stomp on him, stab him, and beat him. Owens screamed for help. A number of other inmates pounded on the walls and called for help, one of them yelling, "[t]hey're killing him up here." Only one jailer was on duty, and he did not come to Owens' assistance. Instead, he called the Greenville City Police, who refused to approach the second floor when they arrived at the Jail. The jailer then called Sheriff Harris and the jail administrator, both of whom refused to come to the Jail. The jailer finally called the chief deputy of the Sheriff's Department, who came to the Jail.

The assault lasted between 30 minutes and an hour, during which time the four inmates stopped beating Owens and returned to their cells several times because they mistakenly thought they heard approaching jailers. Each time, they returned to the dayroom and continued to beat Owens when they realized that nobody was coming. When the assault was over, Owens lay on the floor of the dayroom in a pool of his blood. Inmates continued to call for help. Approximately 20 minutes after the assault ended, the chief deputy removed Owens from the second floor and had him transported to the emergency room.

B.    *District Court's Ruling*

The County moved for dismissal on the ground that it "does not have authority to control or set policies or customs for the operation of the Butler County Jail, nor does it have the authority to promulgate

policies for treatment of inmates housed in the Butler County Jail." The district court granted the County's

motion to dismiss without holding a hearing on the ground that the County and County Commission both

enjoyed legislative immunity under the purview of 28 U.S.C. § 1915(e)(2)(B)(iii). Clearly, legislative

immunity is not applicable in this case. As is plain from the title of Section 1915, that statute applies only

to proceedings in forma pauperis, which this suit was not. More importantly, however, it is well settled that

"immunity from suit under Section 1983 extends to public servants only in their individual capacities," but

does not protect governmental entities. *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 677 n. *, 116

S.Ct. 2342, 135 L.Ed.2d 843 (1996). In this case, the County Commissioners were not sued in their

individual capacities. Therefore, legislative immunity has no bearing on the complaint in this case. The

district court clearly erred in concluding that the County and County Commission enjoyed any sort of

legislative immunity from this suit.

The County concedes that the district court clearly erred in dismissing the suit on this basis, but asks

that we nonetheless affirm the dismissal because the complaint fails to state claims of constitutional

deprivations for which the County is responsible under this Court's en banc decision in *Turquitt v. Jefferson

County, Ala.,* 137 F.3d 1285 (11th Cir.1998). Alternatively, the County asks that we affirm the dismissal

because the complaint fails to allege that the County was on notice of the constitutional deficiencies at the

Jail.

Looking anew at the allegations in the complaint, we find that Marsh and Owens alleged sufficient

facts to state a claim against the County under Section 1983 for deliberate indifference to a substantial risk

of serious harm at the Butler County Jail. It is true that the County may not be responsible for all of the

conditions at the Butler County Jail. The extent to which the County may be considered to have caused

conditions leading to a constitutional deprivation is prescribed by the duties and responsibilities Alabama

counties have with regard to county jails. This Court has found that:

> The duties of the counties with respect to the jails are limited to funding the operation of the jail and
> to providing facilities to house the jail.... The county commission is charged with erecting and
> maintaining jails, and each county is required to maintain a jail of sufficient size and strength to
> secure the prisoners.... In construing these provisions, the Alabama courts have made it clear that

the duty of the county to erect and maintain a county jail pertains exclusively to the physical plant of the jail. The duty to maintain a jail under [Alabama Code] § 11-14-10 is merely the duty to keep the jail and all equipment therein in a state of repair and to preserve it from failure or decline.

*Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285, 1289-90 (11th Cir.1998) (en banc) (internal quotation marks and citations omitted). Although these duties are not as extensive as those owed by the Sheriff, there is in fact a nexus between the County's sphere of responsibility and the jail conditions alleged to have caused the substantial risk of serious harm.

The complaint alleged that the risk of harm at the Jail stemmed in part from the inmates' ability to fashion weapons by vandalizing the dilapidated physical structure of the Jail and by removing dangerous objects such as metal pipes and broken glass from the ailing building. It is the County that is charged with the duty of maintaining the physical structure of jails and keeping those structure and the equipment therein in a state of repair. Marsh and Owens also alleged that inmates were able to obtain weapons from outside the outdoor exercise area because the perimeter fence was too low. The County was also charged with erecting and maintaining a jail facility of sufficient size and strength to secure the inmates. The complaint also charged that, because all the cell locks on the second floor were broken for at least a year, jailers were afraid to supervise inmates adequately and inmates were able to roam freely among different cells, which created a risk of assault and intimidation. The lack of surveillance was exacerbated by the Jail's failure to use a video or audio surveillance system. Again, it is the responsibility of the County to establish and maintain a jail that is in good repair and is sufficiently secure. Finally, the Jail's alleged under-staffing problems may have been caused by insufficient funding. The County is responsible for funding the operation of the jails.

Moreover, Marsh and Owens did in fact allege that the County was actually aware of the dangerous conditions and did nothing to remedy the problems, evidencing deliberate indifference to the risk of harm. We also find that the complaint contained sufficient facts to allege a causal link both between the acts or omissions of the County and the excessive risk of harm, and between the excessive risk of violence and the injuries suffered by Marsh and Owens.

Because the complaint filed by Marsh and Owens alleged with sufficient particularity all of the

elements necessary to find municipal liability for a constitutional deprivation under Section 1983, we find

that the district court erred in dismissing this case against Butler County and the Butler County Commission.

II.     *Claims against Sheriff Harris*

In their complaint, Marsh and Owens alleged that Sheriff Harris, in both her personal and her official

capacity,[4] was deliberately indifferent "to the substantial risk of harm to inmates at the Butler County Jail."

In addition, Owens alleged that Sheriff Harris, in her personal capacity, was deliberately indifferent to his

serious medical needs.[5]  In order to find that the district court erred in dismissing Marsh and Owens' claims

against Sheriff Harris, we must find that they alleged sufficient facts to demonstrate that Harris, acting within

her discretionary functions, violated their clearly established constitutional rights.

This Court has found that an Alabama sheriff "acts exclusively for the state rather than for the county

in operating a county jail." *Turquitt,* 137 F.3d at 1288.  Because she is an officer of the State, the Eleventh

Amendment immunizes Harris from being sued in her official capacity. *Zatler v. Wainwright,* 802 F.2d 397,

400 (11th Cir.1986).  Thus, the district court was correct in dismissing the claims against Harris in her official

capacity.  In order to state a successful claim under Section 1983 against a state official in her personal

capacity, a plaintiff must first overcome the protections of qualified immunity.  Qualified immunity protects

government officials from civil suit when they have acted within their discretionary functions in a manner

that violates "no clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  "Defendants are

---

[4]Although the complaint states that "Diane Harris is sued in her official capacity as Sheriff of Butler County," the caption states that Harris is sued in her personal as well as her official capacity.  This Court has previously said that "the complaint itself, not the caption, controls the identification of the parties and the capacity in which they are sued." *Welch v. Laney,* 57 F.3d 1004, 1010 (11th Cir.1995).  We did so, however, in allowing a claim to go forward despite a misleading caption.  In this case, the caption is sufficient to put Harris on notice that she was subject to suit under Section 1983.  Because Harris is immune from suit against her in her official capacity, we will consider all claims against her as against her in her personal capacity.  The district court, having addressed the issue of Harris' qualified immunity, also treated the complaint as naming Harris in her personal as well as her official capacity.

[5]In the complaint, Owens asserts this claim against the "Defendants."  Because there is no allegation anywhere else in the complaint to support a theory that the County showed deliberate indifference to his serious medical needs, we will consider this claim as against Sheriff Harris only.

entitled to qualified immunity in a Rule 12(b)(6) motion to dismiss only if the complaint fails to allege facts that would show a violation of a clearly established constitutional [or federal statutory] right." *Kyle K. v. Chapman,* 208 F.3d 940, 942 (11th Cir. Apr.5, 2000).

A.       *Marsh and Owens' Claim of Deliberate Indifference to a Substantial Risk of Serious Harm*

*1. Allegations in the Complaint*

It is well settled law that a "prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer,* 511 U.S. at 828, 114 S.Ct. 1970.  In order to survive Rule 12(b)(6) motion, the Complaint in this case must have alleged that 1) inmates were subjected to a substantial risk of serious harm, 2) Sheriff Harris was deliberately indifferent to that risk, 3) the Sheriff's deliberate indifference caused that risk, and 4) her deliberate indifference caused the harm suffered by Marsh and Owens.  *See Zatler,* 802 F.2d at 400-01.  In order to state the requisite causal connections, Marsh and Owens need not have alleged that Harris was personally involved in the actions that violated their constitutional rights.  This Court has made clear that "[p]ersonal participation is only one of several ways to establish the requisite causal connection....  An official may also be liable where a policy or custom that [she] established or utilized results in deliberate indifference to an inmate's constitutional rights." *Zatler,* 802 F.2d at 401 (internal citations omitted).

Many of the complaint's factual allegations that are outlined above also implicate the Sheriff in the alleged constitutional deprivations.  Marsh and Owens alleged that inmates were able to acquire or fashion weapons due in part to both inadequate supervision by prison personnel and a systematic failure to search inmates when they returned from the exercise yard.  They also alleged that jailers failed to inspect cells and inmates on the second floor, and thus could not conduct "counts" to ensure the health and safety of the inmates.  They further alleged that the personnel at the Jail were inadequately trained and that the Jail was routinely "grossly understaffed."  They charged that the Jail did not have any system for screening entering inmates, and "did not ask new inmates about their mental health background or other medical conditions." Nor did they ascertain whether incoming inmates had any existing conflicts with persons already imprisoned

at the Jail. Moreover, they claimed that the Jail had no system for classifying or separating inmates, instead housing violent offenders with non-violent offenders, serious felons with misdemeanants, juveniles with adults, and mentally ill persons with those in good mental health. Finally, Marsh and Owens alleged that the Jail employed "[n]o system of discipline," and "did not discipline or even segregate inmates who cursed, flooded cells, broke windows, destroyed property, attempted to escape, threatened jailers, or assaulted other inmates." As a result of these alleged failures in supervision, security, and other inmate-related policies, Marsh and Owens alleged that the conditions at Butler County Jail created "an intolerably high risk of intimidation, assault, and other abuse among inmates at the jail."

Marsh and Owens also alleged that Sheriff Harris was aware of the problems and conditions that led to the substantial risk to inmates, and, by failing to remedy those problems, evidenced deliberate indifference to the risk of harm faced by inmates. They alleged that the Jail Administrator had informed Sheriff Harris that the Jail was understaffed, and that the three inmate escape attempts during the first half of 1996 all occurred when only one jailer was on duty. They also contended that the jail inspector for the Alabama Department of Corrections had informed the Sheriff that the Jail was not reasonably secure, and that the Sheriff had received numerous critical inspection reports and inmate complaints. Notwithstanding this notice, Marsh and Owens alleged that the Sheriff did nothing to address the problems in the Jail or to alleviate the substantial risk of harm.

Marsh and Owens alleged in their complaint that Sheriff Harris is responsible under Alabama law for the general operation of the Jail, and thus acts as final policy maker with respect to the operation of the Jail. They further alleged that the substantial risk of harm they faced was a direct result of the staffing and operational policies of the Jail. They alleged that the risk of harm arose from the ability of the inmates to bring weapons from the exercise yard into the Jail, from the inadequate supervision of inmates, from the Jail's failure to classify and segregate inmates, and from the Jail's lack of a disciplinary system.

Finally, Marsh and Owens alleged that Sheriff Harris' failure to remedy the problems at the Jail—that is, her deliberate indifference to the substantial risk of harm faced by the inmates—caused them to suffer

injuries. Both Marsh and Owens alleged that they were attacked by inmates who brandished weapons such as a screwdriver that they may have acquired while outside in the exercise yard. Both victims alleged that they were subjected to prolonged attacks because jailers refused to come to their assistance. In the case of Owens, the only jailer on duty refused to come to his assistance until other Jail personnel could accompany him. After the four attacking inmates allegedly assaulted Marsh, they were not disciplined, interrogated, or segregated, even after they were later heard plotting to assault a female guard. Marsh and Owens alleged that those four inmates were left to roam freely among the rooms on the second floor, where they later assaulted Owens and again attacked Marsh with a fire extinguisher after he returned from the emergency room. Indeed, it was the very day after Marsh was beaten that Owens was extensively beaten while no jailer came to his aid. After being left in a pool of his own blood, Owens was finally removed from the second floor and taken to the emergency room. Owens was treated at the hospital, after which the deputies once again took him into their custody, agreeing to monitor his injuries and his health. Nonetheless, the deputies left him without shoes or supervision by the side of an interstate.

Owens further alleged that he was injured partly as a result of the fact that the Jail did not have any system for screening or segregating inmates. He alleged that he has suffered from mental illness since at least 1979, has been diagnosed as a paranoid schizophrenic with borderline intellectual functioning, and has been institutionalized in a number of mental health facilities. He alleged that the affidavit upon which his arrest warrant was based in July 1996 stated that Owens was a "mental patient" and that he was "talking nonsense." When Owens arrived at the Jail, nobody asked him about his mental illness, and he was placed in the general population on the back side of the second floor. While he was incarcerated at the Jail, Owens alleged that his mental health problems were obvious as he allegedly proclaimed that he was a prophet of God. Another inmate informed a jailer that Owens should be moved because he was "not right in the head" and was aggravating other inmates. Some inmates complained about Owens' hygiene and harassed him, forcing him to move from cell to cell. Owens requested that he be placed in a cell by himself, but his request was refused.

*2. District Court's Ruling*

The district court found that Marsh and Owens had failed to state a claim of deliberate indifference to a substantial risk of serious harm against Sheriff Harris because they had stated insufficient facts to overcome her qualified immunity. In so holding, the court concluded that Marsh and Owens had failed to allege that Harris had crossed a "bright line" into violations of clearly established law.

In order to state a claim that Harris violated clearly established law by displaying deliberate indifference to a substantial risk of serious harm to inmates, Marsh and Owens needed to allege 1) that they were "incarcerated under conditions posing a substantial risk of serious harm," and 2) that prison officials—in this case Sheriff Harris—demonstrated " 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. Marsh and Owens clearly did so in this case. In *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582-84 (11th Cir.1995), this Court found that an inmate alleged sufficient facts to survive the jailer defendants' motion for summary judgment based on qualified immunity. The inmate plaintiff in that case complained that he faced a substantial risk of serious harm from inmate-on-inmate violence, and had in fact been assaulted by other inmates, due in part to the jail's failure to segregate inmates, the jail's under-staffing, the inadequate training of jailers, and the jailers' inadequate supervision and monitoring of inmates. The district court in this case stated that, although Marsh and Owens "have asserted essentially the same claims as the inmates in the *Hale* case," this case is distinguishable because Marsh and Owens had failed to allege that "inmate-on-inmate violence occurred regularly when the jail was over-crowded," as was the case in *Hale.* We do not find that fact to be distinguishing. Marsh and Owens do not need to allege that previous incidents of violence occurred at the Jail in order to state a claim for deliberate indifference to a substantial risk of serious harm. Indeed, the Supreme Court has held that the standard for demonstrating deliberate indifference "does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as] an actua[l] assaul[t] before obtaining relief.' " *Farmer,* 511 U.S. at 845, 114 S.Ct. 1970 (quoting *Helling v. McKinney,* 509 U.S. 25, 33-34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (alterations in original)).

The conditions at the jail in *Hale* that gave rise to the history of inmate-on-inmate violence are substantially similar to the conditions alleged in this case to have created the substantial risk of serious harm

at Butler County Jail. Indeed, the living conditions at Butler County Jail are a good deal worse than were the conditions in *Hale*. Butler County inmates were forced to endure squalid conditions that in fact put prisoners in harm's way rather than securing their safety. Although the "Constitution 'does not mandate comfortable prisons,' ... neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Rather, prison officials have a duty to provide humane conditions of confinement and to protect prisoners from violence at the hands of other prisoners. *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970. "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' ... having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Marsh and Owens alleged that armed inmates were permitted to roam freely and unsupervised among second floor rooms, which housed all classes of detainees. Moreover, the jailers themselves were afraid to perform health and safety checks on the second floor because they were unable to lock down the inmates. These allegations are sufficient to state a claim that inmates at Butler County Jail faced a substantial risk of serious harm at the hands of other inmates. Moreover, the allegations are sufficient to state a claim that Sheriff Harris, as final policy maker for Butler County Jail, violated clearly established laws by creating the conditions at the Jail that gave rise to the threat of danger.

Marsh and Owens also alleged sufficient facts to demonstrate that Sheriff Harris was deliberately indifferent to the risk of harm at the Jail. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 841, 114 S.Ct. 1970. Marsh and Owens alleged both that Sheriff Harris had been put on notice by numerous sources that the Jail was understaffed and that it was "not reasonably secure," and that she had failed to take any steps to alleviate the risk of harm. Allegations that "the defendant-official being sued had been exposed to information concerning the risk and

thus 'must have known' about it ... could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer,* 511 U.S. at 842-43, 114 S.Ct. 1970. Marsh and Owens alleged sufficient facts in their complaint to state a claim that Sheriff Harris was deliberately indifferent to the substantial risk of serious harm at the Butler County Jail.

Because Marsh and Owens alleged all of the elements necessary for a successful claim against a state official in her personal capacity under Section 1983 for deliberate indifference to the substantial risk of serious harm, and because they alleged those elements with sufficient specificity to put Sheriff Harris on notice of the grounds upon which their claim rested, we find that the district court erred in dismissing their claim.

B.      *Owens' Claim of Deliberate Indifference to Serious Medical Needs*

*1. Allegations in the Complaint*

We now turn to Owens' claim against Harris for deliberate indifference to his serious medical needs, which must meet criteria similar to that of the serious harm claim in order to survive a Rule 12(b)(6) motion. The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In order to state such a claim, an inmate must allege more than negligence; he must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 105, 97 S.Ct. 285.

In order to survive Rule 12(b)(6) motion, the complaint in this case must have alleged that 1) Owens suffered from a serious medical need, 2) Sheriff Harris was deliberately indifferent to that need, and 3) Harris' deliberate indifference caused Owens to suffer harm. *See McElligott v. Foley,* 182 F.3d 1248, 1254-55 (11th Cir.1999).

Owens has alleged that he suffered from "serious medical needs" after being released from the hospital following his assault at the Jail. He claims that the hospital staff "instructed the Sheriff's Department

to follow specific procedures to care for Owens's head wounds and other injuries. It instructed them to monitor his level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if any change occurred." His condition was diagnosed by a physician as mandating treatment and monitoring, and he was in a great deal of pain.

Owens also contended that the Sheriff's Department was deliberately indifferent to his serious medical needs. Rather than adhering to the written instructions they received when they signed Owens out of the hospital, the officers released Owens, instructing him to sign his own bond, and dropped him off near an interstate outside of a motel. Owens was barefoot, wearing bloodied clothing, and was severely swollen and bruised. When he stepped out of the officer's car, the officer drove away. Owens was unable to secure a room at that motel, and, after walking dazedly across the interstate, he was also denied entrance to a restaurant. At that point, a city police officer picked him up and ordered a clerk at a Holiday Inn to rent a room to Owens.

Owens did not allege that Sheriff Harris was personally involved in these events. He did, however, allege that the deliberate indifference shown by the officers was pursuant to an official policy of the Sheriff's Department. Owens claimed that the acts allegedly constituting deliberate indifference occurred when the officers of the Sheriff's Department dropped him on the side of the road without administering the medical care the hospital had instructed them to deliver. Owens also alleged that the officers released him in such a manner pursuant to a "policy and custom of releasing sick or injured inmates."

Finally, Owens also alleged that, when he awoke alone on the day following the assault, he was in a great deal of pain and had to be taken back to the hospital in an ambulance. He also alleged that he had to be readmitted to the hospital several days later and that he still experiences pain and limited mobility in his right shoulder as well as uncontrollable shaking in his right arm.

*2. District Court's Ruling*

The District Court dismissed Owens' claim against Sheriff Harris for deliberate indifference to serious medical need on the ground that she enjoyed qualified immunity. The district court concluded that Owens

did not "show that the sheriff was personally involved in the acts or omissions that resulted in the constitutional deprivation," and that he therefore failed to establish a constitutional violation. In order to overcome the defense of qualified immunity in a Section 1983 claim for civil damages from a government official performing discretionary functions, a plaintiff must show that the official has violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. In assessing such Section 1983 claims, the Supreme Court has recently stated that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). *See County of Sacramento v. Lewis,* 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (criticizing the district court for granting summary judgment based on qualified immunity to a government official in a Section 1983 case, without first deciding that a substantive due process violation had taken place, on the ground that the law was not clearly established at the time of the alleged violation); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (stating that "a necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," and that courts should not "assum[e], without deciding, this preliminary issue").

As noted above, this was a Rule 12(b)(6) dismissal. Therefore we look to the complaint to see if Owens has alleged the violation of a federal right. In order to state a claim for a violation of rights under the Fourteenth Amendment,[6] the complaint must allege that Sheriff Harris was not merely negligent but that she

---

[6]Owens was a pretrial detainee at the time of the alleged constitutional violations. "Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees." *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1539 n. 3 (11th Cir.1994) (en banc) (citing *Ingraham v. Wright,* 430 U.S. 651, 671-72 n. 40, 97 S.Ct. 1401, 1412-13 n. 40, 51 L.Ed.2d 711 (1977)). However, this Court has held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir.1994), (quoting *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985)); accord *Tittle,* 10 F.3d at 1539; *Edwards v. Gilbert,* 867 F.2d 1271, 1274 (11th Cir.1989). Accordingly, we analyze Owens' claims under the same standard as applied to Marsh.

committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" and caused Owens to suffer harm. *Estelle,* 429 U.S. at 106, 97 S.Ct. 285; *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir.1999). We have defined a "serious medical need" as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill,* 40 F.3d at 1187.

The condition Owens alleges he was in when he was released by the hospital into the care of the Sheriff's Department qualifies at this initial stage of the proceedings as a "serious medical need." Moreover, by alleging that the officers of the Sheriff's Department failed to follow the instructions given to them at the hospital for caring for Owens' medical needs, and instead left him barefoot by the side of the road, Owens has alleged that they were deliberately indifferent to his serious medical needs.

In order to state a claim against Harris, however, Owens must do more than allege that her employees were deliberately indifferent. Owens must allege sufficient facts to adequately establish that Sheriff Harris' was personally responsible for her employees' actions. The district court held that because the Sheriff was not personally involved at the time of the deputy's actions, she could not be held personally liable. However, as this Court has previously held, "[p]ersonal participation is only one of several ways to establish the requisite causal connection.... An official may also be liable where a policy or custom that [she] established or utilized results in deliberate indifference to an inmate's constitutional rights." *Zatler,* 802 F.2d at 401 (internal citations omitted). Owens did allege that the officers of the Sheriff's Department acted pursuant to a "policy and custom of releasing sick and injured inmates" when they acted with deliberate indifference. Because Sheriff Harris is the final policy maker of Butler County Jail, these allegations are sufficient to state a claim that she acted with deliberate indifference to Owens' serious medical needs.

Because the complaint has alleged the necessary elements to demonstrate that Harris was deliberately indifferent to Owens' serious medical needs, it has also sufficiently alleged that Harris is not entitled to qualified immunity. As we noted in *Hill v. Dekalb Regional Youth Detention Center,* "a finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore

the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." 40 F.3d 1176, 1186 (11th Cir.1994) (quoting *Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir.1992)); *see also Albers v. Whitley,* 743 F.2d 1372, 1376 (9th Cir.1984), *rev'd on other grounds,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).[7]

Owens has also alleged sufficient facts to demonstrate that he was injured by Harris' deliberate indifference. When he awoke alone the day following the assault, he was "in terrible pain" and had to be taken back to the hospital in an ambulance. He returned to the hospital several days later for further treatment. Because we find that Owens alleged sufficient facts to state a claim against Sheriff Harris under Section 1983 for deliberate indifference to serious medical needs, we conclude that the district court erred in dismissing the complaint under Rule 12(b)(6).

REVERSED and REMANDED for further proceedings in accordance herewith.

---

[7]We note that in *Hare v. City of Corinth,* 135 F.3d 320, 327-28 (5th Cir.1998), the Fifth Circuit analyzed the qualified immunity claims in that case and did not decide whether the plaintiff had established deliberate indifference. *Hare* was reviewing a denial of summary judgment, and the court determined that the undisputed facts of the case revealed that the actions taken by corrections officers were not unreasonable in the light of the circumstances and that therefore the officers were entitled to qualified immunity. We also note, however, that under the facts in *Hare,* the plaintiff would likewise not have met the test for deliberate indifference, as the court concluded that officials had acted reasonably under the circumstances. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer,* 511 U.S. at 845, 114 S.Ct. 1970. The Supreme Court has recognized that "[t]he infliction of pain in the course of a prison security measure ... does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Thus a finding that a plaintiff has alleged deliberate indifference sufficiently to survive a 12(b)(6) motion to dismiss does not rule out the possibility that facts may later come to light indicating that the defendant behaved reasonably in the circumstances and thus was not deliberately indifferent. However, the Supreme Court has also held that deliberate indifference to prisoners' serious medical needs constitutes the "unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 104, 97 S.Ct. 285. Once a court has found that a prison official has unnecessarily and wantonly inflicted pain on inmates, it cannot find that conduct to be objectively reasonable. Although facts may later come to light indicating that Harris behaved reasonably in the circumstances and thus was not deliberately indifferent, the allegations in Owens' complaint suffice to survive a 12(b)(6) motion to dismiss for failure to allege a cause of action and to dismiss on the grounds of qualified immunity.